Please be seated. And we have the next case. 311-786-Morning Reading Appellant & I.M.T. Reagan v. American Hoist & Man Lift, Inc. & Pumpkin Man Lift Company, Inc. Appellees by Gary Jansen & Dick Sheen Mr. Reagan? Aye, Your Honor. It's not a report. It's a fancy client. It's like reading. May it please the Court. My name is Mike Reagan, together with Joe Mirabali, who is seated at the Council table. I represent the Administrator of the State in the seat of Charles Reed. I know the Court's familiar with the facts. I know that we're told not to spend our time reciting the facts. So I don't intend to. I need to discuss the facts here because they are unique and they're important. So this man lift, which has eight steps on it, which covers the five floors, has a grating at each level, a grating where you step on to then get onto it. That grating has a 25-inch circular opening through which the belt passes. The steps in the man lift are 16 inches wide and 10 inches deep. There was indeed a grating and access point for the man lift at the second floor level. Mr. Reed, Mr. Rhodes, were on the third floor going down to the first. It's said in the defendant's brief here that there was no second floor in this building. It's true there wasn't a second floor. It is not true that there wasn't a second floor landing for the man lift. There was a catwalk. So it was a, you know, for our purposes, there was a second floor. And if you look at the photo, it's C2580. It is a photograph looking down at it. The treads for the steps and the handrails were essentially the same color as the belt. They were not contrasting colors. And that is a clear violation of the American Society of Mechanical Engineers standard. So I'll return to that physical layout in a moment. So what do we know about Mr. Reed? Mr. Reed was 6 feet 1 inches tall. He weighed 357 pounds. He and Mr. Rhodes had spent the day working in the cooling tower elsewhere. They returned to the supervisor's office, which was on the third floor. So in, up on the belt lift, over to the supervisor's office. Mr. Rhodes signed out, and he testified that it was Mr. Reed's intention to then sign out. They both had a common plan. They intended to ride the man lift back to the first floor and return to their shop and shower and leave for the day. The only evidence in this case was that Reed was in good health. And Dr. Tease, who was one of our experts, offered her affidavit that there was no evidence of any medical reason why Mr. Reed might have fallen, which distinguishes this case from many other cases, including ones that members of this panel have participated in, where there were serious questions about the medical condition of the decedent. So there's a lot written in the briefs about distances and times. But they're really not very important. And to the extent that they are important, they militate in our favor. And I suggest that the clearest understanding of the close sequencing of things here is gained by focusing on Rhodes' testimony of the time. Rhodes was the fellow employee who went down the man lift first. So he believed that Reed was right behind him, intending to do the same thing he was doing. There's no doubt about that. And Rhodes rode from the third floor to the first, which, in his estimate, took 15 to 20 seconds. He says he then walked somewhere between 10 to 35 feet, depending upon which day he gave the estimate. And he estimates that that took no more than 10 seconds. He then heard the crash, immediately turned around and saw Mr. Reed at the base of the man lift on the grating. And so the 25 to 30 seconds elapsed from Reed getting on the lift, from Rhodes getting on the lift, until the fall. And so the distance of 300 feet from the supervisor's office to the third floor man lift is really a red herring. I mean, what we're talking about here is from the time that Rhodes got on the man lift until Reed is dead at the bottom, is 25 to 30 seconds. So the synthesis of these facts, the physical layout of the place, and what we know about Mr. Reed, lends credible support to Dr. Chiodo's expert opinion offered by Amphidavid. And he says, it would not have been even remotely possible for Reed to have gotten to the first floor grating, started on the third, dead on the first, without riding the man lift from the third floor through the second floor and ultimately slipping off the man lift between floors one and two on the way down. So I respectfully ask the court to think about how logical that opinion is. And in large part, that's the task of the court of the day, to determine whether there are sufficient inferences to give rise to a genuine material trial issue of fact, which would then have to go to the jury, as opposed to being decided on summary judgment. So Reed's size, this was a very large man. The size of the opening, 25 inches, 25 inches on the third floor, 25 inches on the second floor. The steps would block the opening, so that if there was a step in an opening, which is clearly not the case at all moments, but it would be impossible for essentially anyone, anybody to get through outside of the step. And the only person, and he would not have been found directly at the bottom. Let me just ask you about that. He said basically it's impossible for this fellow to fall straight down. Right. Would you expect a 350 pound object falling down to take a 90 degree turn somewhere along the fall? What other way would it fall but straight down? If he slipped off, and if he were at some angle other than, and I'm not quite sure I understand the question completely, but to get through the holes he has to be, all of the stars have to be aligned for him to have been able to fall through three floors. But then at that point, then what is causing him to turn sideways? And what informs Justice Smith's question is that the only sign of contact here between Mr. Reed and any of the structure, and they looked, and they looked for days to see what they could find, was that the left side of his head and the left side of his hard hat hit the top of the containment cage at the bottom. And there was pieces of his body that were left at that location. And there's no doubt that he struck there. And so the only way that he gets to be sideways at that point, the only logical way, and certainly a permissible inference from a jury, is that he's on the step, allowing him to come through two floors, and then slips and goes sideways. Exactly how that happened, we don't know. But this isn't something where you have a wide open parking lot or a stairway or something else and you really have no idea what happened. We're here measuring inferences, measuring the strength of inferences, not weighing, maybe I've given a bad word there, we're trying to determine whether there's a question of fact. You have an incipient question. Okay, so he must have ridden it from the third at least through the opening on the second. Right. So then what caused him to fall after he got through that opening? Several things could have happened. We can't, I can't tell you precisely what happened at that point. He could have lost his footing, he did lose his footing for some reason, and either couldn't regain the footing because of the slipperiness or he could not quickly enough regain a handhold if it was a handhold that he lost. Well how is a jury going to decide that without speculating? They, you know, we can look at other cases. We can look at, I have the names here, but there was a case where the man was on the ladder, he was almost at the top. The evidence was that he intended to descend, but nobody saw him descend, and the court said that summary judgment was reversed there because there was a generalized condition of slipperiness on the ladder rungs and it was up to the jury to determine as to whether those caused the problem. There was another case where the man was on the ladder, he was maybe leaning to the left, but nobody saw that, to reach a whip line hanging down from a crane, and that crane line may have struck him, but nobody saw that, and the court said there too that that was enough. Now if Rhodes had turned around, suppose hypothetically, if he turned around momentarily and saw Reed falling from a step, what more would that add to the case? Not much, it would just tell us that he was falling, but it wouldn't tell us precisely what the mechanism was. But in these cases, the weight of the law is that they go to the jury, and juries have to do difficult things from time to time, and this is such a case, and we don't, I filed the motion for supplemental authority, I don't intend to argue at any particular length, but the June 6th opinion from the first district in the Gunite case, the driver did not know what caused the truck to tip over, but the court said the summary judgment should not have been granted there, that this was enough to go to the jury. The defendant's claims that the manner of the fall is a complete mystery, cannot be taken seriously. The trial court did not have the task of deciding how this fall occurred, the court's only task was to decide whether there was a genuine, immaterial, triable issue of fact. Is it remotely possible for this man to have jumped, fallen, whatever, from the third floor and gone down as they've suggested? Even if there's some remote possibility of that, the unlikelihood of that is not sufficient to defeat all possible inferences otherwise. So it's for this reason that I start off by saying that the facts matter, but the law matters here too. The principles which govern summary judgment are well known to the court, but they have application here and they have to be honored. So proximate cause is a question of fact for the jury, unless there can be no differences in the judgment of reasonable people on the inferences to be drawn. When reasonable persons could draw divergent inferences, the issue must be given to the jury. And if the facts permit more than one conclusion, then summary judgment must be denied. And lastly, on a motion for summary judgment, that's what we're here on, we're not on a motion for a new trial, we're not here on manifest way or any of those things like that. All inferences must be decided in favor of the opponent to the motion. Now, the principles which govern circumstantial evidence also militate in favor of the point of fear. So it's true that circumstantial evidence has to give rise to an inference of probability and not just to an inference of possibility. But it is not accurate. Now, there are some cases, there are some recurrent cases, but they're wrong. I don't think I can say that. To say that circumstantial evidence cannot be relied upon if there is more than one possible inference to be drawn, that's not the law. Circumstantial evidence need not exclude all other possible inferences. As long as there is a rise to an inference of probability that the jury can consider, then that's sufficient. And the use of circumstantial evidence, and this is a direct quote if I may from McCullough versus Gallagher and Speck, the use of circumstantial evidence is not restricted to instances where the circumstances support only one logical conclusion. We know that there were serious defects and code violations. American Voice letter of February 9, 2004, we found items that are in need of attention in the near future. This is 2004, several years before the accident. The step treads also need to be replaced. They are worn smooth and could become a safety issue in the near future. These are not things that require immediate attention, but they should not be overlooked. April 2004 inspection, tearing and lifting around the edges. Well, let me ask you, the maintenance company, don't they need an order from the employer to fix it? Well, yes and no. We have, there is deposition testimony, but there's only eight steps. And so Jerry Brown, who's Midwestern, the employer's deposition C-1741, said that minor repairs or replacements of the treads were within the responsibility of American Voice. They had the authority and responsibility to go ahead and do that. And they said it was the contractual response. This is Midwestern, the contracting party, saying it was the contractual responsibility of American Voice to determine when the treads needed repair or replacement. Jim Anderson, American Voice deposition C-2593, the technician who's part of our compliance is to tell Midwest that there's a violation of ASME standards. And he said, this is Anderson, I was the manager of American Voice, I think it ultimately is my responsibility to call them and say we should fix this or that. Now, a little more directly back to your question. They were asked to give a quote. That is, Midwest employer said to American Voice, okay, give us a quote. So if your theory then becomes, if they'd have given them the quote, then the company would have said, okay, fine, go fix it, and they would have fixed it before this fall. Isn't that quite a reach? I don't think so at all. American Voice occupies an amazingly important position in the safety. These are dangerous things. I've ridden them in investigation cases. I've ridden them a lot. And so American Voice is charged with maintaining this thing. And the evidence here, I've ridden some of it. There's a lot more. It's their responsibility to tell Midwest, you've got a problem. This is unsafe, that's out of compliance, et cetera. And they did that. Here's what they didn't do. One part they didn't do, and this alone makes this summary judgment reversible, in my respectful opinion, and that is that the contrasting colors were not there, and it's a violation of the ASME. It's something which enables somebody on the belt to more readily figure out what's going on and adjust. And American Voice never told Midwest about that. So that's one thing they were required to do in terms of examining for compliance that they never did. Secondly, there's a jury question here on their performance of the contract when months before they were required, they were requested to give a quote, and they didn't do it. And so, I mean, this is a fatal gap in the safety mechanism, and Mr. Reid paid for his life with it. So we've talked about the expectations of the parties, and I've read to you excerpts from both sides of the contract who said this was American Voice's responsibility, and there's no doubt that they were asked to provide a quote in large, you know, plenty of time, and they didn't do it. Okay, thank you. You know, I'd like to comment just on a few of the cases. McCullough versus Gallagher and Speck I've talked about a little bit. I read a quote from it, but that was a man of his stuff, and it was different. But when you read the case closely, as I'm sure the court will, they didn't know whether the court couldn't tell whether the decision, actually he didn't die, whether that person was on the step or whether his jacket was on the step. They said, you know, we can't tell, but either way the circumstantial evidence was found to be sufficient. And I commend that court or that case to the court as being, I think, a good summary of the application of the circumstantial evidence rules. Block versus Lohan is the guy leaning from the side of the ladder, possibly hit by the line or the ball from the crane. We don't know, but the court found that that was sufficient, and the court said we can rely on the application of the principles of physics and engineering. McKenna versus Duofast is the last case I'll mention, is the case where the guy was at the top of the ladder, but then nobody saw him again. They knew what his intent was, which was to go down, and the court said additionally there was evidence of dangerous defects throughout the length of the ladder, the poorly spaced and slippery rungs. Now, there were only eight steps, as I said. American Hoist felt that these were dangerous enough that they all had to be replaced. It was not a massive job. They had authority to do things. In the quotes, it's in the record, they had authority to do things on a routine maintenance basis and simply bill them for it without going through the process. And because there were only eight steps and because there was this direction for American Hoist that they all had to be replaced, then the likelihood of Reed having been on a defective step was quite high. Thank you. Thank you, Mr. Reagan. Mr. Jansen, is that who's coming first? The Police Court. Gary Jansen on behalf of Defendant American Hoist. The substantive facts in this case are essentially agreed upon. I dispute the issue with regard to whether there was a second floor landing, but, again, I don't think it's crucial because even if we assume that Mr. Reed was on the lift, we still have no explanation as to what caused him to fall. So, in essence, in accordance with the Omar case, the salient issue here is whether there's, with reasonable certainty, that defendant's acts or omissions were the proximate cause of Charles Reed's fall. And here, as the trial court found, there's not even circumstantial evidence as to what caused Mr. Reed to fall from the lift. And I think the breakdown in plaintiff's analysis of this case comes in their brief, where they state, we have a two-pronged approach to proximate cause. One, to show that Mr. Reed was on the man lift, and secondly, to show that there were defects in the man lift. Well, that analysis eliminates and neglects the crucial third prong, which is, what was the cause of the fall? In other words, it's not enough to show he had some contact with the defect, not enough to show that there was a defect, but then you have to take the next step to establish, was that defect the proximate cause of Mr. Reed's fall? And in this case, I would submit that there's no evidence, circumstantial or otherwise, to establish any of the three prongs, that Mr. Reed was on a man lift, that there were defects in the man lift, and that the defects in the man lift caused Mr. Reed's fall. And I think, with regard to Mr. Reed and whether he was ever even on a man lift, the evidence is that no one saw Mr. Reed approaching the man lift. The last time he was seen was when he was in the sign-off office, 100 yards from where the man lift is located. Now, the point relies upon the intent that Mr. Reed expressed, an intent to ride the man lift down to the first floor. While in other cases that may be a pertinent issue, I think in this particular case it's of no import, because it doesn't establish whether Mr. Reed ultimately made it onto a man lift step or fell through the opening or fell while he attempted to board the man lift. So the mere fact that he intended to take the man lift down is insufficient. I mean, Roach knew he was behind him, did he not? Roach said Reed was never on the lift at the same time. No, I'm not saying that, but he knew he was behind him coming towards the man lift. He wasn't in the office. I mean, he was past the office at that point. He never testified that he knew he had signed off. When he was asked how much distance between the sign-off office and the lift, he said 300 feet, and he was asked in that 300 feet, were you ever where you saw Mr. Reed, and he said no. And since that's the entire distance between the office and the man lift, you can only assume by that answer that he never saw him leave the office and begin to walk towards the lift. But in any event, the cases that have been cited by plaintiff's counsel are cases where there's some contact and actual evidence that there has been contact with the defect. In this case there isn't, because we don't know what happened when he ultimately reached the area. And the nature of this particular device is such that it's certainly just as likely that he could have fallen while attempting to board it because it's a moving lift. It never stops, as opposed to getting on, riding it, and for some reason stepping and slipping. Let me ask you this. Let's shift gears a little bit. What legal or contractual duty did your client have to give a quote, repair quote, if one was requested? The duty would arise one of two ways, either by contract or common law. There's certainly no common law duty to give a quote or proposal if someone asks. If someone asks for a quote or proposal, certainly a contractor can choose not to quote it or propose work for it. So the common law duty is none. The contractual duty is absolutely none, because the contract says specifically in it that the contractor may submit a quote or proposal. And if they do, the employer will turn around and submit a purchase order for that work to be done. So in this particular instance, it's unrefuted that there was never written authorization given to American Hoist to make the repairs to the step treads. Nor a duty to respond to a request for a quote with a quote. Absolutely not. Correct. The contract says that they may submit a quote or proposal if they choose to. And, in fact, the contract is specific where it says requests for quotes or proposals are not authorizations to perform work. And there's a specific form for a request. And, in fact, the contract states that the contractor proceeds to do work based on a simple request for a quote or proposal without a written purchase order that they will not get paid for their work. So while there was any question under the contract that there was no contractual duty to submit a quote or proposal for the work, and as has been previously indicated with respect to any argument that they had a duty to advise that this condition needed to be repaired, Jerry Brown of Midwest Generation was already aware of that, and his testimony is I asked for a quote or proposal. So we're beyond that issue as well. Employer, if the machine was unsafe, the employer should shut it down, right? Pardon? The employer could shut the piece of machinery down. Correct. Whether it's a man lift or any other piece of machinery. Correct. If it's unsafe, the employer can pull the workplace, shut the machine down. Absolutely. The evidence with regard to the man lift defects, although it was not pointed out, what we're talking about in terms of the step treads is lifting and tearing on the vertical edge. These are actually 14 deep by 16 wide, and they go in a horizontal and have about an inch vertical lift. The photographs and the testimony is that what needed to be replaced and what happens with these is that the grid or abrasive surface on these sheets begins to lift or tear on the vertical edge. It would have been impossible for Mr. Reed to put his foot on a 1-inch step and not the 16-inch horizontal step. So even beyond that issue, it's not a situation where these steps need to be replaced or anything on the horizontal surface of the steps. And beyond that, with regard to whether there was a defect or not, the only evidence in that regard is plants experts looked at two out of eight, which is actually 16 steps if you're counting both sides because they flip when they go up and down the lift as they come around, and they looked at photographs of two of those steps, one side of each, five years after the accident, and said, by looking at that, I think they're worn. There's no testimony to support that, and there's certainly no testimony to know what step Mr. Reed was on. In the testimony that Mr. Brown had said, I decided to replace them all, there's no testimony that every single step or even the majority of the steps needed to be replaced. His idea at that point in time was if you have to do one or two and it's daring, I'm going to get them all done at one time. And it was also pointed out earlier, the fact that even if a quote or proposal was submitted by American Hoist, there are certainly Midwest Generation, the employer, could have decided to do that work at another point in time, could have decided for financial reasons not to do it, but more importantly, this particular accident occurred during a power outage, and that's the reason Mr. Reed and the other workers were using the man lift more frequently than they would have been. And again, to think that they would shut this down during the peak period of use of the hoist is not reasonable and not probable in this instance. With regard to the cause of the accident, again, there's just no evidence circumstantially or even drawing inferences as to what would have caused Mr. Reed to fall from the lift. And again, I would harken back to the nature of this as a moving operating device, and deboarding and boarding is certainly the most probable situation of having a fall from this. Once the rider is on the lift, there's no reason for him to step or move or do anything at that point in time. Thank you. It's certainly possible someone could lose their balance, or as the investigation team found, perhaps he dropped a shirt and went to get it, but there's no belt, there's nothing that holds him on, there's nothing that allows him to get on and be secure. He has to time it out and step onto this thing at the right point in time as it's moving. Just to point out, we discussed already the duty issue. I would just like to discuss the case law quickly. You agree, then, with Mr. Reagan that this is an extremely dangerous machine? I would not dispute that, Your Honor. There are not very many of these in existence anymore, and certainly... Is that right? I don't dispute that. My company is a service company, and a maintenance company, though, and their job was... The fact is that they are reducing the use of nanomachines altogether. That's accurate. That's accurate. With regard to... I think the latter case is the most on point, and that's a situation where the individual was found at the bottom of an elevator shaft, and there they had two of the three prongs established. He came in contact with the defect, and there was an admitted defect because the doors were open and the elevator wasn't there. But again, the court found and granted summary judgment because there's no explanation as to what caused it. Same with the Bickerman, the Third District case. And the plaintiff's case, aside from the McCullough case, is much different because the plaintiff testified as to what happened. Even the recently submitted case, the Foreman case, although the plaintiff couldn't recall how the accident happened, there was testimony regarding how he said the accident happened, and that was admitted as an excited utterance, and he testified that the load was leaning. That's what caused it to fall. There were two other co-workers who testified. Their trucks were loaded in the exact same fashion, and their trucks leaned. So I think the Foreman case is much different than our case here. The cases I've cited are unwitnessed fatalities where someone comes upon the decedent, and there's no idea what caused the accident. And the majority of those cases where at least two of the three prongs are established. Here we don't have any of the three prongs established circumstantially or by inference. Thank you. Mr. Schoen?  Schoen, okay. I'm sorry. May it please the court. I'm not going to ask you that question, Mr. Schoen. No, well, I was going to have an answer for that one, but that's okay. We are still making them. May it please the court. I guess what I would say just briefly is that in regards to this case, approximately 40 years ago, while I was graduating from law school 50 pounds lighter and a full head of hair, this man lift was manufactured in Minnesota by Humphrey Man Lift and shipped to then Commonwealth Edison and installed by another company. And then eventually Commonwealth Edison's coal plants were bought out by Midwest Generation. I think the most... I'm sorry. No, no. I think one of the most important things to remember in this case is that when you try... When you were probably in the trial courts and you looked at the first instruction and they just recently changed it because it's a little longer now and it's all about the Internet and so forth, but one of the things that they tell juries is that you're not to decide a case by guess, speculation, and conjecture. And I think that based on the evidence in this case, that if this case would go to a jury based on the evidence that we have, there is no other way the jury could decide this other than guess, speculation, and conjecture. I looked at the Foreman case that came to me and I'm not going to do a response because in that case they talk about the Struts case, I think it is, and the other case, the two cases that they talk about in that case that the court used in Foreman in deciding the case and said those cases are dissimilar. And in the Foreman case you have a low tipping over and as counsel has said, counsel in their brief cited all types of cases and I think the law is all pretty clear in regards to proximate cause and that you have to have some facts rather than just guess and speculation to show proximate cause. And I think that's what's lacking in this case. And it's not really so important whether the plaintiff was on the man lift when he fell or fell getting on the man lift. We just don't know these things. And then to say, to take that and say, well it must have been a slippery step that causes, can only be guess and speculation. And that's one step further because we manufactured this man lift 40 years beforehand, put it in, had the instructions that we gave at the time, put in the man lift and there was no testimony that this man lift ever misoperated in any way other than the way it's designed to do at any time before or after this incident. We have a situation where the other situation, we have the situation here where you have no testimony as to any sort of defect in the product. Now obviously it's not a product's liability case because that part of the case was stricken before it got up here because of the time involved. So then we're just dealing with the negligence. And the only negligence that they came up with, that they say in their brief that still stands, is in regards to the warnings. And I don't know that there's any evidence that a jury could look at and say, well because of that giving that warning, the individual fell. There's no, it's not there. And that's why we cited Cain versus the Weber, or Warner case, which is a ladder manufacturer. And that's a situation where the individual said, I didn't read the warnings. And the court said that you can't go after somebody if they don't read the warnings that are on the ladder. And in this situation, unfortunately there's no testimony one way or another as to what the plaintiff knew or didn't know. And obviously there were a lot of depositions in this case at Midwest Generation. They had in-services and training for their employees and had safety meetings and all those sort of things. So I mean there's no testimony. There is testimony that he's worked at this particular plant for two and a half years, and this wasn't the first time that he had used this device. Counsel, you have one minute. Okay. I would just thank you for your kind attention. I think that all the cases are laid out by all sides in the brief, but when it all comes down to it, there just is no factual, there's no facts that make this case a case that shouldn't, where summary judgment shouldn't have been granted in a case where the case should go to a jury. And as I said, a jury would have to decide this case, even taking the experts. We don't want to all be guests or speculation or conjecture. Thank you very much. Thank you. Mr. Reagan, some rebuttal? Please. Very quickly. First of all, as to Humphrey and Mr. Shane's argument, the only argument they raised in their brief to this court was the approximate cost. That was the extent of that argument. And, by the way, that was really the only issue that the circuit court was involved in on their return. I realize this is a denormal review, so I just want to point that out. And, Justice Schmidt, in terms of what the employer could have done, et cetera, there's no doubt about the vital role that American Hoist played here and that Midwest relied upon American Hoist completely, per se. The evidence is that Midwest did not have any internal expertise in terms of evaluating the safety of this thing, and nobody with any occupational health training, nobody who was skilled in these things at all. American Hoist was the person, it was the entity, and American Hoist said, it's my responsibility to tell them what needs to be done. In terms of Mr. Jansen's suggestion that, well, maybe the steps were just fine, the defendants, of course, had an extensive investigation of this thing afterwards, and their report, and I think it was issued six days later, but I'm not exactly sure, says that the treads were warm. In a concluding comment, I mean, the summary judgment of this case, that is the lack of a trial, the lack of being able to present this to the jury and to permit them to come out to draw inferences, based upon these unique facts. This isn't like any other case. This isn't like Levitt versus Farwell Towers, where there was simply an open door. This place is a dangerous place, and you're familiar with these machines, and I am, these lifts, and I am too, and inattention. I mean, how is a jury going to decide this case other than deciding whether there's sympathy for the family of the decedent or which lawyer warms up to them the best? I mean, how are they going to decide, based on this evidence, as to whether any error on the part of American Voice was a practical cause of the decedent's death? One of the things that the jury can consider is what else would have caused him to fall off. I mean, the inferences, the clear inferences, is that he had to have been on the lift to get down to where he was and to have this happen. And then when you have a generalized condition, and it's throughout the record here, you have a generalized condition of worn steps. You have a relatively small number of steps. The likelihood of him being on a worn step is greater than it is in the case where the court permitted the case to go to the jury, where there was slippery rungs, et cetera. How many worn steps were there, too? How many worn steps? Oh, they were all worn. The American Voice report in 2004 says the treads are worn and need to be replaced, and that this is a serious matter and requires a lot of attention. It becomes a question, a safety matter. Now, it's a death case. Death cases are always hard. But application of an overly strict rule on circumstantial evidence really does sound a death knell for death cases. I mean, there's enough here. When you look at the uniqueness of the facts and the expert testimony, I believe there's enough here to support this case going to the jury. Thank you. Thank you, Mr. Reagan. All right. Thank you, all three, for your arguments here this morning. This matter will be taken under advisement. A written disposition will be issued. And right now, the court will be in a brief recess for panel seats  The court is now on recess.